1  RICHARD D. CARROLL (State Bar No. 116913)
   JENNIFER A. COONEY (State Bar No. 218815)
2  CARROLL, KELLY, TROTTER, FRANZEN, McKENNA & PEABODY
   rdcarroll@cktfmlaw.com / jacooney@cktfmlaw.com
3  111 West Ocean Boulevard, 14th Floor
   Post Office Box 22636
4  Long Beach, California 90801-5636
   Telephone No. (562) 432-5855 / Facsimile No. (562) 432-8785
5  **Attorneys for Defendant, Children's Hospital Los Angeles**

6
   ROBERT L. MCKENNA, III (State Bar No. 166650)
7  DAVID P. PRUETT (State Bar No. 155849)
   **CARROLL, KELLY, TROTTER, FRANZEN, McKENNA & PEABODY**
8  rlmckenna@cktfmlaw.com / dpruett@cktfmlaw.com
   111 West Ocean Boulevard, 14th Floor
9  Post Office Box 22636
   Long Beach, California 90801-5636
10 Telephone No. (562) 432-5855 / Facsimile No. (562) 432-8785
   **Attorneys for Defendant, Children's Hospital Los Angeles Medical Group**

11

12

13              UNITED STATES DISTRICT COURT

14      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15

16 N.L., a minor, by and through his Guardian        CASE NO.: 15-cv-07200-AB-FFM
   ad litem, and all others similarly situated
17                                                    Judge André Birotte Jr.
18              Plaintiffs,                           Courtroom 4

19     vs.                                            Complaint Filed:    September 11, 2015
                                                      Trial Date:         Not yet set
20 CHILDRENS     HOSPITAL      LOS
   ANGELES;   CHILDRENS    HOSPITAL
21 LOS ANGELES MEDICAL GROUP,
                                                      **DEFENDANTS' NOTICE OF MOTION
22              Defendants.                           AND MOTION TO DISMISS SECOND
                                                      AMENDED COMPLAINT PURSUANT
23                                                    TO RULE 12(b)(6); MEMORANDUM
                                                      OF POINTS AND AUTHORITIES**
24

25                                                    **Date:        June 6, 2016**
                                                      **Time:        10:00 a.m.**
26                                                    **Courtroom:   4**

27

28     PLEASE TAKE NOTICE that on June 6, 2016 at 10:00 a.m. in Courtroom 4, of the

1 | above-entitled United States District Court, located at 312 North Spring Street, Los Angeles,
2 | California, Defendants Children's Hospital Los Angeles ("Hospital") and Children's Hospital
3 | Los Angeles Medical Group ("Medical Group") will move the Court pursuant to Federal Rule of
4 | Civil Procedure 12(b)(6) for an order granting dismissal of Plaintiff's Second Amended
5 | Complaint for failure to state a claim.

6 |       Defendants' motion will be based upon this Notice, the accompanying Memorandum of
7 | Points and Authorities, the complete files, pleadings and records in this action, and upon such
8 | oral and/or documentary evidence that the court deems just and proper.

9 |       This motion is made following the conference of counsel pursuant to L.R. 7-3 which took
10 | place on January 7, 2016.

11 |

12 | DATED: April 25, 2016              CARROLL, KELLY, TROTTER, FRANZEN,
                                  McKENNA & PEABODY

13 |

14 |                            By:    */s/ David P. Pruett*
15 |                                ROBERT L. McKENNA
                               DAVID P. PRUETT
16 |                                Attorneys for Defendant,
                               CHILDREN'S HOSPITAL LOS ANGELES
17 |                                MEDICAL GROUP

18 |
19 | DATED: April 25, 2016              CARROLL, KELLY, TROTTER, FRANZEN,
                                    McKENNA & PEABODY

20 |

21 |                            By:    */s/ Richard D. Carroll*
22 |                                RICHARD D. CARROLL
                               JENNIFER A. COONEY
23 |                                Attorneys for Defendant,
                               CHILDREN'S HOSPITAL LOS ANGELES

24 |
25 |
26 |
27 |
28 |

## TABLE OF CONTENTS

I.      INTRODUCTION.........................................................................................1

II.     FACTUAL BACKGROUND....................................................................1

        A.      Defendants Are Private Parties............................................. 1

        B.      Plaintiff's Allegations of His Claim and Facts Subject to Judicial Notice............2

        C.      Examination According to Specific Request While in DCFS Custody.........5

        D.      Plaintiff's Putative Class Allegations....................................6

III.    RULE 12(b)(6) AUTHORIZES MOTIONS TO DISMISS FOR FAILURE TO
        STATE A CLAIM..........................................................................7

IV.     DEFENDANTS WERE PERMITTED TO EXAMINE PLAINTIFF (AND OTHER
        PATIENTS) IN ACCORDANCE WITH CALIFORNIA LAW......................7

        A.      Statutorily Mandated Report of Abuse.............................................7

V.      PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT A § 1983 CLAIM AGAINST
        DEFENDANTS...........................................................................10

        A.      First Prong: SAC Does Not Allege Constitutional Deprivation Resulting from
                State Action...................................................................11

                1. Plaintiff Failed to Allege a Constitutional Deprivation.....................11

                2. Assuming Arguendo a Constitutional Deprivation, it Was Not the Result of
                Defendants' Exercise of State's Authority.........................................19

        B.      Second Prong: Defendants Cannot In All fairness Be Called State Actors....20

        C.      Plaintiff Has Not Alleged Facts that Defendants Were State Actors.............22

VI.     CONCLUSION..........................................................................25

1

# TABLE OF AUTHORITIES

2 **Federal Cases**

3
4 *Anthony v. Cnty. of Sacramento, Sheriff's Dep't, 845 F. Supp. 1396, 1400 (E.D. Cal. 1994)* ..................................................................................................................... 22

5
6 *Bell Atl. Corp. v. Twombly* (2007)
550 U.S. 544 .................................................................................................... 7

7 *Benavidez v. Gunnell* (10th Cir. 1983)
722 F.2d 615 ................................................................................................. 23

8
9 *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte* (1987)
481 U.S. 537 [95 L.Ed.2d 474, 107 S.Ct. 1940] .......................................... 12

10
11 *Butler v. Goldblatt Bros., Inc.* (7th Cir. 1978)
589 F.2d 323 ................................................................................................. 23

12
13 *Camreta v. Greene* (2011)
563 U.S. 692 [131 S.Ct. 2020, 179 L.Ed.2d 1118] ................................ 12, 13

14 *Collins v. Womancare* (9th Cir. 1989)
878 F.2d 1145 ............................................................................................... 23

15
16 *Ferguson v. City of Charleston* (2001)
532 U.S. 67 [121 S.Ct. 1281, 149 L.Ed.2d 205] .......................................... 17

17
18 *Florer v. Congregation Pidyon Shevuyim, N.A.* (9th Cir. 2011)
639 F.3d 916 ........................................................................................... 21, 22

19
20 *Fonda v. Gray* (9th Cir. 1983)
707 F.2d 435 ................................................................................................. 23

21 *Franklin v. Fox* (9th Cir. 2002)
312 F.3d 423 ........................................................................................... 21, 23

22
23 *Howerton v. Gabica* (9th Cir. 1983)
708 F.2d 380 ................................................................................................. 23

24
25 *Jackson v. Metro. Edison Co.* (?YEAR?)
419 U.S. 345 ................................................................................................. 24

26
27 *Kirtley v. Rainey* (9th Cir. 2003)
326 F.3d 1088 ............................................................................................... 24

28

*Lee v. City of Los Angeles* (9th Cir. 2001)
  250 F.3d 668 ............................................................................... 12

*Leer v. Murphy* (9th Cir. 1988)
  844 F.2d 628 ........................................................................... 11, 21

*Mich. Dep't of State Police v. Sitz* (1990)
  496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481] ....................... 15, 16

*Mueller v. Auker* (9th Cir. 2009)
  576 F.3d 979 ................................................................................ 20

*Mueller v. Auker* (9th Cir. 2012)
  700 F.3d 1180 .............................................................................. 20

*Nat'l Treasury Employees Union v. Von Raab* (1989)
  489 U.S. 656 [103 L.Ed.2d 685, 109 S.Ct. 1384] ...................... 15, 16

*Ohno v. Yasuma* (9th Cir. 2013)
  723 F.3d 984 ....................................................................... 10, 24, 25

*Radcliffe v. Rainbow Constr. Co.* (9th Cir. 2001)
  254 F.3d 772 ................................................................................ 23

*Sjurset v. Button* (9th Cir. 2015)
  810 F.3d 609 .......................................................................... 19, 20

*Sutton v. Providence St. Joseph Med. Ctr.* (9th Cir. 1999)
  192 F.3d 826 ................................................................................ 20

*Swartwood v. County of San Diego* (S.D.Cal. 2014)
  84 F.Supp.3d 1093 ....................................................................... 18

*United States v. Martinez-Fuerte* (1976)
  428 U.S. 543 [49 L.Ed.2d 1116, 96 S.Ct. 3074] .......................... 15

*United States v. Place* (1983)
  462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] .......................... 15

*Vernonia Sch. Dist. 47J v. Acton* (1995)
  515 U.S. 646 [115 S.Ct. 2386, 132 L.Ed.2d 564] .................... 14, 15

*Wallis ex rel. Wallis v. Spencer* (9th Cir. 1999)
  202 F.3d 1126 .............................................................................. 18

*West v. Atkins* (1988)
  487 U.S. 42 [108 S.Ct. 2250, 101 L.Ed.2d 40] ........................ 19, 22

*Lee v. City of Los Angeles* (9th Cir. 2001)
250 F.3d 668 ........................................................................................... 12

*Leer v. Murphy* (9th Cir. 1988)
844 F.2d 628 ..................................................................................... 11, 21

*Mich. Dep't of State Police v. Sitz* (1990)
496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481] ................................. 15, 16

*Mueller v. Auker* (9th Cir. 2009)
576 F.3d 979 ........................................................................................... 20

*Mueller v. Auker* (9th Cir. 2012)
700 F.3d 1180 ......................................................................................... 20

*Nat'l Treasury Employees Union v. Von Raab* (1989)
489 U.S. 656 [103 L.Ed.2d 685, 109 S.Ct. 1384] ................................. 15, 16

*Ohno v. Yasuma* (9th Cir. 2013)
723 F.3d 984 ............................................................................... 10, 24, 25

*Radcliffe v. Rainbow Constr. Co.* (9th Cir. 2001)
254 F.3d 772 ........................................................................................... 23

*Sjurset v. Button* (9th Cir. 2015)
810 F.3d 609 ..................................................................................... 19, 20

*Sutton v. Providence St. Joseph Med. Ctr.* (9th Cir. 1999)
192 F.3d 826 ........................................................................................... 20

*Swartwood v. County of San Diego* (S.D.Cal. 2014)
84 F.Supp.3d 1093 ................................................................................. 18

*United States v. Martinez-Fuerte* (1976)
428 U.S. 543 [49 L.Ed.2d 1116, 96 S.Ct. 3074] ...................................... 15

*United States v. Place* (1983)
462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] ...................................... 15

*Vernonia Sch. Dist. 47J v. Acton* (1995)
515 U.S. 646 [115 S.Ct. 2386, 132 L.Ed.2d 564] ................................. 14, 15

*Wallis ex rel. Wallis v. Spencer* (9th Cir. 1999)
202 F.3d 1126 ......................................................................................... 18

*West v. Atkins* (1988)
487 U.S. 42 [108 S.Ct. 2250, 101 L.Ed.2d 40] ...................................... 19, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff N.L., a minor, alleges that these private party Defendants violated his constitutional rights, asserting a cause of action under 42 U.S.C. §1983.  As in prior pleadings, in the Second Amended Complaint ("SAC"), Plaintiff claims violation of First, Fourth, and Fourteenth Amendment rights, alleging deprivation of "parental love, affection, and companionship" and of "right to privacy, family integrity and the right to remain free of non-consensual unwarranted forensic medical examinations." SAC (Doc. 52), at 2, 15-16. (¶¶ 1, 63, 65).  Plaintiff alleges Defendants medically examined plaintiff without his parents' consent without a warrant, and without exigent circumstances.  See SAC, at 15 (¶64).

The facts alleged, and subject to judicial notice, demonstrate that Defendants' examination was done at the direction of the County of Los Angeles, Department of Child and Family Services ("County" or "DCFS").  At the time, DCFS had taken legal custody of Plaintiff during the course of its investigation of abuse of plaintiff's brother (who was the victim of shaken baby syndrome, brain bleeding, and neurological compromise).

Although Defendants communicated with governmental officials under the circumstances alleged, including a report of suspected abuse of Plaintiff's brother, any such "collaboration" did not result in constitutional injury.  Plaintiff's allegations do not identify a constitutional injury. While DCFS was in custody of N.L., it had authority to direct Defendants' to examine Plaintiff. That authorization was not contingent upon a warrant, parental consent, or exigent circumstances.  Further, even if there was a constitutional injury, Defendants were not the cause of it and Defendants' "collaboration" did not transform them into state actors.    Rather, Defendants' collaboration involved complying with California law by making a "mandated report" of suspected child abuse of plaintiff's brother and by examining N.L. at the apparently lawful direction of DCFS, which had taken custody of N.L.

## II.    FACTUAL BACKGROUND

### A.    Defendants Are Private Parties

Defendants are not government entities.    Plaintiff alleges Children's Hospital Los

1 Angeles ("Hospital") "is a medical center, the specific form of which is presently unknown."

2 SAC, at 2 (¶6).  Children's Hospital Los Angeles Medical Group ("Medical Group") "was and is

3 a California corporation in good standing." SAC, at 3 (¶9).  Affiliated with the Hospital and

4 Medical Group, plaintiff alleges: "The CARES Team is a multidisciplinary team of individuals

5 who have extensive training in the field of child abuse. The team does assessments of children

6 who are suspected of being abused." SAC, at 3 (¶8).  Plaintiff alleges: "Defendants are paid

7 money by the County of Los Angeles for these forensic medical examinations." SAC, at 7

8 (¶27).  Plaintiff N.L.'s claim is founded upon his allegation that DCFS "seized him – also

9 without a warrant or court order, and without notifying his parents." SAC, at 5 (¶20) (Doc. 52)

10 (see also, FAC, Doc. 35, 2:4-8). "N.L. was placed in foster care that evening, September 19,

11 2008. DCFS filed a juvenile dependency petition shortly thereafter." SAC, at 5 (¶23).

12        **B.**   **Plaintiff's Allegations of His Claim and Facts Subject to Judicial Notice**

13       Plaintiff "was three years old" at the time of the events at issue. SAC, at 2 (¶5).

14       The event that led to DCFS taking custody of N.L. was when his 11 month old brother,

15 A.L., who is not a party to this action, "sustained a serious brain injury" while at daycare and

16 "was airlifted to Defendant Hospital for treatment." SAC, at 4 (¶¶14-15).

17       Based upon concerns for A.L., the SAC alleges "a hospital social worker made a

18 suspected child abuse referral to the Los Angeles County Child Abuse Hotline." *Ibid.* As will

19 be discussed, that report was required by California statutes mandating health care providers to

20 report known or suspected child abuse.

21       Plaintiff goes on to allege that "Los Angeles County Department of Children and Family

22 Services ('DCFS') investigators responded" and "without conducting any adequate

23 investigation, the DCFS investigators seized A.L. without first obtaining a warrant and in the

24 absence of any exigency." SAC, at 4 (¶16).  Plaintiff alleges that A.L. sued County in another

25 action. SAC, at 4 (¶17).  Plaintiff identified that prior action, as *Arce v. Childrens Hospital Los*

26 *Angeles* 211 Cal.App.4th 1455 (2012). SAC, at 4-5, 11 (¶¶18, fn. 4); see also, FAC, at 5, fn. 2

27 (Doc. 35). In that published decision, the California Court of Appeal recited the allegations of

28 plaintiff, represented by the same attorneys as in this case, stating, "that the County of Los

1 | Angeles, the Los Angeles County Department of Children and Family Services (DCFS) and
2 | Childrens Hospital Los Angeles (Hospital) violated [A.L. and N.L.'s] constitutional rights by
3 | detaining both children without judicial authorization or adequate cause." *Arce*, 211
4 | Cal.App.4th at 1459. *Arce* declined to address the issue the CHLA §1983 arguments, because
5 | "in the trial court proceedings, they 'did not demurrer [sic] on the basis of the "color of state
6 | law" elements.'" *Arce* at 1490.

7 | Defendants again request judicial notice of the plaintiff's Complaint in the *Arce* state
8 | court case. RJN, Exh. 1. That Complaint asserted that when plaintiff's parents first "arrived at
9 | Children's Hospital they were met by ER Social Worker Brett McGillivry," who informed them
10 | "that A.L. had just arrived and was getting an MRI." *Id.*, 5:27-6:1. "The doctors believed that
11 | A.L. was bleeding from his brain but they did not know where." *Id.*, 6:5-6. The parents, with
12 | McGillivry sitting with them, called the day care caregiver, who (suspiciously) changed her
13 | story regarding the events leading to discovery of A.L.'s injury. *Id.*, 6:12-21. McGillivry, after
14 | informing the parents he was going to do so, called the Los Angeles Police Department,
15 | prompting officers to come to the Hospital, question the parents, and make a child abuse report.
16 | *Id.*, 6:22-28. Refuting any contention that defendants cast suspicion on the parents, Plaintiff
17 | alleged that McGillivry told police officers "that he believed [the parents] were not responsible
18 | for A.L.'s injuries and that they could remain with A.L." *Id.*, 6:28-7:4.

19 | Regarding defendants' role as health care providers, the prior Complaint recounted that
20 | "MRI results showed that there was blood pooled on A.L.'s brain," "that further testing was
21 | required," and that "A.L. underwent various tests, including a second MRI, a skeletal exam, and
22 | an eye exam." *Id.*, 7:5-8. Defendants' examinations identified "retinal hemorrhaging in both
23 | eyes," "MRIs showed that A.L. had an acute subdural hematoma," causing seizures," and
24 | "[a]ccording to the doctors, these symptoms are usually indicative of Shaken Baby Syndrome,"
25 | a diagnosis of child abuse. *Id.*, 7:9-13.

26 | [See http://www.ninds.nih.gov/disorders/shakenbaby/shakenbaby.htm.]

27 | Under those circumstances, DCFS investigated, without any involvement on the part of
28 | Hospital and Medical Group, leading to the County's exercise of its custodial authority over

1  N.L.  Plaintiff alleges, "[a]fter DCFS workers seized A.L. from the custody of his parents and
2  expelled them from the hospital, a second set of workers went to the home where N.L. was
3  staying and seized him - also without a warrant or court order, and without notifying his
4  parents." SAC, at 5 (¶20). Exercising County's authority, "N.L. was placed in foster care" and
5  "DCFS filed a juvenile dependency petition shortly thereafter." SAC, at 5 (¶23).

6      Regarding taking custody of N.L., while the County social workers were "kicking [the
7  mother] out of the hospital," the prior Complaint described the actions of County DCFS official
8  Eva Yomtobian, who went to the family home, and asserted her governmental authority by
9  presenting "her DCFS badge and a letter from the State of California."   RJN, Exh. 1, 8:19-27.
10 Yomtobian entered the home "[w]ithout a warrant" and "claimed to have a warrant to take N.L.,
11 but no warrant was ever provided." *Ibid.* "Two police officers soon arrived at the home." *Id.*,
12 8:27-28.  In response to DCFS' "hold" of A.L. and custody of N.L., the parents "called the
13 DCFS command post," and "left several voice mails for social worker EVA YOMTOBIAN,
14 who they understood was responsible for removing N.L from their care." RJN, Exh. 1, 8:19-21.

15     Regarding the County's medical assessment of N.L. for indications of abuse, the prior
16 Complaint specified that it was initiated by public health nurse KARL MARUYAMA, "an
17 officer, agent, and employee of COUNTY and DCFS," who "conducted a physical examination
18 of minor Plaintiff N.L.," "searching for signs of sexual or physical abuse," and conducted
19 "without the consent and/or presence of N.L.'s parents, without a warrant or court order
20 authorizing the examination, and in the absence of exigent circumstances." *Id.*, 2:18-20, 9:16-
21 21. Plaintiff's parents "made repeated calls to DCFS to determine the whereabouts of their other
22 son, N.L." and they were eventually informed of his placement by County with a foster mother.
23 *Id.*, 9:28-10:8.  The County's assertion of authority to maintain custody included "lies" that
24 custody was based upon a warrant and a court order. RJN, Exh. 1, 10:9-15.

25     Five days after N.L. was taken into County custody, according to the prior Complaint,
26 "EVA YOMTOBIAN and DCFS filed Juvenile Dependency Petitions for A.L. and N.L. under
27 section 300 of the California Welfare and Institutions Code," and filed "a Detention Report."
28 RJN, 10:27-11:16.   That Complaint acknowledged that County, in the petition filed by

1   Yomtobian, asserted justification for taking custody of N.L. based on such statements as "the
2   *parents'* deliberate, unreasonable and neglectful acts place A.L. and N.L. at risk of physical and
3   emotional harm, damage and danger." *Id.*, 10:27-11:28.  Although plaintiff alleged the County's
4   petition was falsified and omitted known exculpatory evidence, the allegations emphasized the
5   governmental authority wielded by County.  *Ibid.*  Plaintiff specifically alleged that County had
6   violated his rights "by subjecting minor Plaintiffs A.L. and N.L. to physical examinations
7   without consent, authority, or the presence of [their] parents." RJN, 31:4-32:5.  As summarized
8   by the Court of Appeal, plaintiff's asserted that "[w]hile in the custody of DCFS, N.L. was
9   subjected to a physical examination that was conducted without the parents' consent."  (*Arce v.*
10  *Childrens Hospital Los Angeles* (2012) 211 Cal.App.4th 1455, 1463.)

11      C.    **Examination According to Specific Request While in DCFS Custody**

12        Plaintiff alleges: "On September 22, 2008, DCFS phoned the Hospital to schedule an
13  appointment for N.L. to have an investigatory forensic medical examination. This examination
14  was scheduled for September 24, 2008, at 9:45 am."  SAC, at 7 (¶29).  The examination
15  proceeded on September 24, 2008, at "approximately 10:02 am." SAC, at 7 (¶30).

16        Relative to an issue raised by the Court's order on the FAC, whether the examination was
17  "before or after a juvenile court ordered the children release from foster care" (Doc. 49, at 5),
18  the SAC now alleges it did not occur until "the late afternoon and/or early evening," and "At the
19  time of this forensic medical examination, the Detention hearing, or any other court hearing, had
20  not taken place."  SAC, at 7 (¶33).  Relative the Court's question about "whether this
21  examination exceeded the scope of DCFS' request" (Doc. 49, at 5), the SAC indicates it did not,
22  as Plaintiff alleges the examination was done "at the specific request and direction of DCFS,"
23  "at the behest of DCFS," with no allegation of exceeding scope of exam that DCFS ordered
24  them to perform.  SAC, at 7-10, 16 (¶¶28, 34, 40, 43, 46, 66).

25        Regarding that examination, Plaintiff alleges it included "full examination of his penis,
26  testicles and anus," "that his response to the "anal wink" test was normal," and that X-Ray
27  examination was done, "a full skeletal bone survey." SAC, at 8 (¶¶36-38).  Consistent with
28  Plaintiff's allegations that there Plaintiff was not the victim of abuse, Plaintiff acknowledges the

1  Defendants' examination resulted in "normal" findings "and indicated that he was not the victim
2  of sexual abuse or physical abuse." SAC, at 8 (¶38).

3      Plaintiff has added more allegations concerning Defendants alleged policy and practice
4  for performing examinations at the direction or behest of DCFS, without determining "whether
5  N.L.'s forensic medical examination was appropriate and/or necessary," instead performs
6  examinations "pursuant to contract and at the specific request and direction of DCFS." SAC, at
7  10, 17-18 (¶¶44, 69).

8      Plaintiff does not allege Defendants conducted the examination for the purpose of falsely
9  accusing Plaintiff's parents of child abuse. Plaintiff's claim is not based upon a violation of
10 rights based upon the examination *qua* examination. Nevertheless, the SAC includes allegations
11 that a "test on N.L.'s anus indicated that his sphincter was fully functional and that his response
12 to the 'anal wink' test was normal." SAC, at 8 (¶36). The nature of a medical "anal wink" test
13 as a test that is not invasive or penetrating. The dictionary definition for "anal wink" is: "A
14 visible puckering at the margin of the external anal sphincter, evoked by stroking the perianal
15 skin with a pin; absence of an anal wink reflex suggests a defect in either sensory or motor
16 nerves or in the central pathways that mediate this reflex." *Segen's Medical Dictionary* (2011).
17 "The anal wink, anal reflex, perineal reflex, or anocutaneous reflex is the reflexive contraction
18 of the external anal sphincter upon stroking of the skin around the anus." *Wikipedia*.

19     [See, http://medical-dictionary.thefreedictionary.com/anal+wink.]

20     [See, https://en.wikipedia.org/wiki/Anal_wink.]

21 **D.**    **Plaintiff's Putative Class Allegations**

22     Plaintiff's putative class allegations assert that examinations of other patients, like that of
23 N.L., were done by defendants pursuant to contract and at the direction and behest of
24 governmental authorities. SAC, at 16 (¶66). Plaintiff alleges: "Defendants regularly and
25 systematically perform non-consensual unwarranted invasive forensic medical examinations
26 pursuant to contract, and at the behest and direction of DCFS." *Ibid.*

27     Plaintiff also alleges: "The Hospital regularly collaborates and cooperates with DCFS in
28 performing forensic medical examinations as one of DCFS' foster care hubs," referring to

1   deposition testimony that the Hospital was a "designated hub for Department of Children and
2   Family Services," referring to County's arrangements for "medical hubs for examinations of
3   children, generally speaking the ones going into foster care, but it can also be other children who
4   are under investigation," referring to "designated places where there are child abuse expert
5   physicians" and "interviewers." SAC, at 6 (¶26); Doc. 52, pp. 35-37. Plaintiff argumentatively
6   alleges: "The Hospital routinely collaborates and partners with DCFS, law enforcement, and the
7   courts"; and, "CARES Team members include representatives from law enforcement and
8   DCFS." SAC, at 6, (26). Those allegations were based upon general information and evidence
9   relative to who the CARES Team ends up "*working with*" when asked to perform child abuse
10  examinations. Doc. 52, at 46-48, 64-65; Doc. 52, at 85, 97.

11      Plaintiff alleges: "Defendants regularly perform forensic medical examinations at the
12  specific request of, and pursuant to contract with, DCFS and law enforcement during juvenile
13  dependency and criminal investigations." SAC, at 9 (¶42). The SAC reiterates that at the behest
14  of government officials examinations are done on "specific request." SAC, at 7-10 (¶¶ 28, 34,
15  42, 43, 44, 46). Plaintiff refers to testimony describing purposes for performing exams, to
16  assess for abuse, not the authority to do so. Doc. 52, at 55. Regarding authorization for
17  examinations, plaintiff refers another, arguing Hospital "collaborates with the Los Angeles
18  County Department of Children and Family Services," based upon, "My understanding is that
19  the forensic examinations are conducted at the request of the [DCFS]." Doc. 52, p. 89.

20  ## III.   RULE 12(b)(6) AUTHORIZES MOTIONS TO DISMISS FOR FAILURE TO
21     STATE A CLAIM

22      To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough
23  facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.
24  544,570 (2007).

25  ## IV.   DEFENDANTS WERE PERMITTED TO EXAMINE PLAINTIFF (AND OTHER
26     PATIENTS) IN ACCORDANCE WITH CALIFORNIA LAW

27  ### A.   Statutorily Mandated Report of Abuse

28  Regarding the statutory obligations imposed upon defendants to report abuse, Cal. Penal

1  Code § 11165.9 provides: "Reports of suspected child abuse or neglect shall be made by
2  mandated reporters ... to any police department or sheriff's department, not including a school
3  district police or security department, county probation department, if designated by the county
4  to receive mandated reports, or the county welfare department." Licensed health care providers
5  are "mandated reporters," including physicians, nurses, clinical social workers, and professional
6  clinical counselors. Penal Code § 11165.7(a)(21).

7      A mandated reporter must, "within 36 hours of receiving the information concerning the
8  incident," make a report when the reporter has "knowledge of or observes a child whom the
9  mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect."
10 The report must include "the information that gave rise to the reasonable suspicion of child
11 abuse," as well as "the child's name, the child's address, present location, and, if applicable,
12 school, grade, and class; the names, addresses, and telephone numbers of the child's parents or
13 guardians; and the name, address, telephone number, and other relevant personal information
14 about the person or persons who might have abused or neglected the child."

15     **B.**   **County's Custody Of N.L. and Authority to Direct Examination**

16     After the mandated report by a Hospital employee, DCFS made all determinations
17 relative to taking custody of plaintiff N.L. and presenting N.L. to defendants for an examination
18 for potential abuse. As plaintiff's Second Amended Complaint acknowledges, those actions
19 were done by DCFS, not by defendants. Plaintiff specifically alleged both N.L. and his brother
20 were unlawfully seized from their parents care by the County of Los Angeles. N.L. was sent to
21 foster care. Doc. SAC, at 4, 5 (¶¶ 16, 20). While N.L. was in its custody, DCFS had authority
22 to have N.L. examined.

23     Indeed, California statutes authorized DCFS to take custody of N.L. and have him
24 examined. For instance, The Lance Helms Child Safety Act, California Welfare and Institutions
25 Code section 324.5(a) provides authorized county social workers, to take a child into protective
26 custody based upon "allegations of physical or sexual abuse" and "as soon as practically
27 possible, consult with a medical practitioner, who has specialized training in detecting and
28 treating child abuse injuries and neglect, to determine whether a physical examination of the

child is appropriate."   Further, Welfare and Institutions Code section 306 authorizes "[a]ny social worker in a county welfare department" to "[t]ake into and maintain temporary custody of, without a warrant, a minor … who the social worker has reasonable cause to believe is a person described in subdivision (b) [e.g., 'The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness'] or (g) ['The child has been left without any provision for support'] of Section 300…."

Plaintiff's theory of liability in this case is inconsistent with Penal Code § 11171(a), which states: "(1) The Legislature hereby finds and declares that adequate protection of victims of child physical abuse or neglect has been hampered by the lack of consistent and comprehensive medical examinations."   Subdivision (2) states the Legislature's conclusion that "Enhancing examination procedures, documentation, and evidence collection relating to child abuse or neglect will improve the investigation and prosecution of child abuse or neglect as well as other child protection efforts."

Therefore, the Legislature required governmental authorities and "child advocates" and "other appropriate experts" to "establish medical forensic forms, instructions, and examination protocols for victims of child physical abuse or neglect…."   Penal Code § 11171(c) that the forms to be used would include "a place for notation," documentation, of categories of information, including: the report of suspected abuse "to law enforcement authorities or children's protective services" (subd. (1)); "Addressing relevant consent issues, if indicated" (subd. (2)); "taking of a patient history of child physical abuse or neglect that includes other relevant medical history" (subd. (3)); "The performance of a physical examination for evidence of child physical abuse or neglect" (subd. (4), emphasis added); "The collection or documentation of any physical evidence of child physical abuse or neglect, including any recommended photographic procedures" (subd. (5)); The collection of other medical or forensic specimens" (subd. (6)); "preservation and disposition of evidence" (subd. (7)); "Complete documentation of medical forensic exam findings with recommendations for diagnostic studies, including blood tests and X-rays" (subd. (8), emphasis added); and "An assessment as to whether there are findings that indicate physical abuse or neglect" (subd. (9).

1      "A physician and surgeon or dentist or their agents and by their direction may take

2  skeletal X-rays of the child without the consent of the child's parent or guardian, but only for

3  purposes of diagnosing the case as one of possible child abuse or neglect and determining the

4  extent of the child abuse or neglect." Cal. Pen. Code § 11171.2(a).

5  **V.  PLAINTIFFS ALLEGATIONS DO NOT SUPPORT A § 1983 CLAIM AGAINST**

6      **DEFENDANTS**

7      In *Ohno v. Yasuma*, 723 F.3d 984 (9th Cir. 2013), the Court recited the "broadly

8  applicable two-prong framework for analyzing when governmental involvement in private

9  action is itself sufficient in character and impact that the government fairly can be viewed as

10  responsible for the harm of which the plaintiff complains." *Id.* at 994. "The first prong asks

11  whether the claimed constitutional deprivation resulted from 'the exercise of some right or

12  privilege created by the State or by a rule of conduct imposed by the state or by a person for

13  whom the State is responsible.'" *Ibid.* "The second prong determines whether the party charged

14  with the deprivation could be described in all fairness as a state actor." *Ibid.*

15      Analyzing Plaintiff's SAC according that framework, it should be dismissed because

16  plaintiff has failed to allege a constitutional injury. Even if, for the sake of argument, a

17  constitutional injury was assumed, any such injury was not the result of any action on the part of

18  defendants (who acted in accordance with DCFS direction). Finally, Defendants did not act

19  under color of law to deprive plaintiff of any rights, and are not "state actors" (based upon the

20  standards applicable to private parties).

21      In accordance with law, Defendants made a mandated report to the Los Angeles Police

22  Department. DCFS then investigated the circumstances of the suspected abuse of Plaintiff's

23  brother, apparently including assessing whether Plaintiff was also the victim of, or was at risk

24  for, abuse. While Defendants' mandated report prompted DCFS to investigate plaintiff's

25  family, Defendants were not involved with that investigation. Investigating, DCFS took both

26  plaintiff and his brother into custody, removing Plaintiff from the custody of their parents.

27      In the SAC, plaintiff states: "This lawsuit is not based on Defendants' conduct as it

28  relates to N.L.'s unwarranted seizure." (SAC 5:28 (fn. 3).) In other words, plaintiff concedes

1  that Defendants have no responsibility for DCFS' taking custody of N.L.

2  While plaintiff was in DCFS' custody, it directed defendants to examine Plaintiff, as
3  California statutes conferred upon DCFS the authority to direct such an examination to be done.

4  Consistent with Plaintiff's concession that this action is not based upon any contention
5  that Defendants were responsible for DCFS' "unwarranted seizure," the action against
6  Defendants should be dismissed.

7  Defendants interacted with government officials in two ways: (1) the report to the police
8  of suspected abuse of plaintiff's brother; and (2) the conduct of a medical examination of
9  plaintiff.  Those interactions do not support a constitutional claim against defendants.  The
10  mandatory reporter laws of the State of California required defendants to make the report to the
11  police.  The laws of the State of California authorized County to direct that plaintiff be
12  examined, and to have such examinations performed by private parties.  Even if the examination
13  was not authorized, it was the County's directive to do it, not defendants'.

14  A.  **First Prong: SAC Does Not Allege Constitutional Deprivation Resulting from**
15  **State Action**

16  To state a claim for relief under Section 1983, Plaintiff must allege "that the conduct
17  deprived the claimant of some right, privilege, or immunity protected by the Constitution or
18  laws of the United States." *Lee v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988) (accord *Ove v.*
19  *Gwinn*, 264 F.3d 817, 824 (9th Cir. 2001), citing *West v.Atkins*, 487 U.S. 42, 48 (1988)).

20  **1. Plaintiff Failed to Allege a Constitutional Deprivation**

21  The SAC does not distinguish between alleged violations of different constitutional
22  rights, instead generally alleging violation of First, Fourth, and Fourteenth Amendment rights by
23  alleged deprivation of "parental love, affection, and companionship" and violation of "right to
24  privacy, family integrity and the right to remain free of non-consensual unwarranted forensic
25  medical examinations." SAC (Doc. 52), at 2, 15-16. (¶¶ 1, 63, 65).  Plaintiff alleges Defendants
26  medically examined plaintiff without his or his parents' consent and without his parents being
27  present, without a warrant, and without exigent circumstances.  See SAC, at 15 (¶64).

28  The nature of Plaintiff's allegations appear to assert that Defendants' medical

1 examination constituted a violation of his Fourth Amendment right to be free from unreasonable
2 searches and seizures.  This seems indicated by Plaintiff contention that such an examination
3 could not be constitutionally performed without a warrant.  SAC, at 7, 12-13, 15, 17, 18-19,
4 (¶¶32, 57(b, c, f), 64, 65, 66, 69(a, e), 72(c), 75)

5 Presumably, Plaintiff's theories of violation of First and Fourteenth Amendment rights
6 arise from the same "unwarranted" examination, such that Plaintiff contends the examination
7 interfered with "'the companionship and society" between parent and child "without due process
8 of law" under the Fourteenth Amendment. *Lee v. City of Los Angeles* (9th Cir. 2001) 250 F.3d
9 668, 685 (quoting *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985), which
10 cited *Santosky v. Kramer*, 455 U.S. 745, 753, 71 L.Ed.2d 599, 102 S.Ct. 1388 (1982)). "'This
11 constitutional interest in familial companionship and society logically extends to protect
12 children from unwarranted state interference with their relationships with their parents.'" *Lee* at
13 685 (citation omitted).

14 Regarding the First Amendment, *Lee* instructs that it "protects those relationships,
15 including family relationships, that presuppose 'deep attachments and commitments to the
16 necessarily few other individuals with whom one shares not only a special community of
17 thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Lee* at
18 685 (quoting, *Board of Dir. v. Rotary Club*, 481 U.S. 537, 545, 95 L.Ed. 2d 474, 107 S.Ct. 1940
19 (1987)).

20 Plaintiff has failed to allege any constitutional injury under those Amendments, as there
21 was not a requirement for a warrant to do the examination.  The examination was authorized by
22 law.  Therefore, it was necessarily done in accordance with due process and that the protection
23 of the child justifies the interference with family relationships.

24 There is no established law to inform defendant private parties that the Fourth
25 Amendment would be violated by DCFS taking custody and ordering an examination of a child
26 based on suspicion of child abuse.  Rather, in *Camreta v. Greene* 563 U.S. 692 (2011), the Court
27 vacated the decision of the Ninth Circuit that concluded that "a state child protective services
28 worker and a county deputy sheriff" who "interviewed a girl at her elementary school in Oregon

about allegations that her father had sexually abused her" had infringed the girl's Fourth Amendment by failing to obtain a warrant. *Id.* at 697-698, 131 S.Ct. 2020, 2026-2027, 179 L.Ed.2d 1118, 1127-1128. Moreover, the Supreme Court's decision left intact the aspect of the Ninth Circuit ruling determining that the government officials who had conducted the interview, and on the basis of which taken the girl from the custody of her parents, were entitled to qualified immunity. *Ibid.* Because the CPS worker and deputy sheriff were protected by qualified immunity, they and other similarly situated officials can expect immunity in future damages actions because the court did "not resolve the claim because the official has immunity." *Id.* at 706. "He thus persists in the challenged practice; he knows that he can avoid liability in any future damages action, because the law has still not been clearly established." *Ibid.*

That analysis applies under the circumstances presented here. There is not Ninth Circuit authority establishing that the seizure of N.L. by DCFS violated constitutional standards. There is not Ninth Circuit authority establishing that DCFS lacked statutory authority to authorize a medical examination of N.L. (or other children taken into custody pursuant to California statutes).

Without established authority that DCFS officials would be violating the rights of N.L., or other children, when taken into DCFS custody, there could be no constitutional injury as a result of Defendants' actions of following the directives of the DCFS to examine a child apparently lawfully in DCFS custody.

That rule was applied to medical examinations in *Yin v. California*, 95 F.3d 864, 869 (9th Cir. 1996), determining that some examinations can be constitutionally performed without "probable cause nor a warrant … when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.* at 869 (quoting *Vernonia* at 653). *Yin* rejected claims by State of California employee "that requiring her to submit to an unwanted medical examination would violate both the American with Disabilities Act (the ADA) … and the Fourth Amendment." *Yin* at 867. In that case, "a goal of the proposed medical examination was to determine whether Yin was 'an individual with a

1    disability or ... the nature or severity of [her] disability.'" *Id.* at 868.  The Ninth Circuit further

2    rejected Yin's "claims that defendants' insistence that she undergo an independent medical

3    examination constitutes a violation of her Fourth Amendment right to be free from unreasonable

4    searches and seizures" and that "the state must secure a warrant before it can compel her to

5    submit to a medical examination." *Id.* at 869.

6        In reaching that conclusion, *Yin* explained, "[i]n 'special needs' cases, a category that

7    includes criminal and civil proceedings, the Court dispenses with the probable cause and warrant

8    requirements and simply applies a balancing test to determine if a search or seizure is reasonable

9    and thus constitutional." *Id.* at 869.  *Yin* observed the rule had been applied to conclude that

10    "neither the warrant requirement nor the probable cause requirement should apply to 'non-

11    investigatory, work-related purposes,' or 'for investigations of work-related misconduct.'" *Ibid.*

12    (citing *O'Connor v. Ortega*, 480 U.S. 709, 725, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (1986)

13    (plurality).)  Further, *Yin* observed that a "warrantless search of student's purse because of need

14    to maintain discipline in schools" was constitutionally permitted.  *Ibid.* (citing *New Jersey v.*

15    *T.L.O.*, 469 U.S. 325, 83 L.Ed. 2d 720, 105 S.Ct. 733 (1985)).

16        Broadly, *Yin* observed: "Medical examinations and medical tests that are not conducted

17    as part of a criminal investigation are generally subject to the balancing test, not the

18    warrant/probable cause requirement." *Yin* at 869 (citations omitted).

19        The Court's analysis in *Vernonia Sch. Dist. 47J v. Acton* 515 U.S. 646, supports the

20    conclusion that a warrant was not required for the examination put at issue by Plaintiff herein.

21    *Vernonia* observed, "a warrant is not required to establish the reasonableness of all government

22    searches; and when a warrant is not required (and the Warrant Clause therefore not applicable),

23    probable cause is not invariably required either." *Id.* at 653, 115 S.Ct. 2386, 2390-2391, 132

24    L.Ed.2d 564, 574 (1995) ("*Vernonia*") (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 97 L.

25    Ed. 2d 709, 107 S. Ct. 3164 (1987)); citing *Skinner v. Railway Labor Executives' Ass'n*, 489

26    U.S. 602, 619, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989).)

27        *Vernonia* explained, "the text of the Fourth Amendment indicates, the ultimate measure

28    of the constitutionality of a governmental search is 'reasonableness.'" *Id.* at 652.  As here, in

1   cases in which "there was no clear practice, either approving or disapproving the type of search

2   at issue, at the time the constitutional provision was enacted, whether a particular search meets

3   the reasonableness standard '"is judged by balancing its intrusion on the individual's Fourth

4   Amendment interests against its promotion of legitimate governmental interests."'" *Id.* at 652-

5   653 (citations omitted).

6       "Where a search is undertaken by law enforcement officials to discover evidence of

7   criminal wrongdoing," in *Vernonia*, the Supreme Court recognized that it "has said that

8   reasonableness generally requires the obtaining of a judicial warrant." *Id.* at 653.   Supporting

9   that proposition, the Court cited *Skinner*, wherein the Court referred to cases in which there was

10  suspicion that the subject the search "has been, is, or is about to be engaged in criminal activity."

11  *Skinner* at 619 (e.g., *United States v. Place* (1983) 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77

12  L.Ed.2d 110, 117-118).   *Vernonia* recounted the Supreme Court has ""upheld suspicionless

13  searches and seizures to conduct drug testing of railroad personnel involved in train accidents,

14  see *Skinner, supra*; to conduct random drug testing of federal customs officers who carry arms

15  or are involved in drug interdiction, see [*Treasury Employees v. Von Raab*, 489 U.S. 656, 665,

16  103 L.Ed.2d 685, 109 S.Ct. 1384 (1989)]; and to maintain automobile checkpoints looking for

17  illegal immigrants and contraband, [*U.S. v. Martinez-Fuerte*, 428 U.S. 543, 560-561,   49

18  L.Ed.2d 1116, 96 S.Ct. 3074 (1976)], and drunk drivers, *Michigan Dept. of State Police v. Sitz*,

19  496 U.S. 444, 110 L.Ed. 2d 412, 110 S.Ct. 2481 (1990).   *Vernonia* at 653-654.

20      In assessing the constitutionality of compulsory drug testing to school athletes, *Vernonia*

21  considered it "Central" to its assessment that "the subjects of the Policy are (1) children, who (2)

22  have been committed to the temporary custody of the State as schoolmaster."   *Id.* at 654.

23  Further, the Supreme Court noted that minor children "lack some of the most fundamental rights

24  of self-determination--including even the right of liberty in its narrow sense, i. e., the right to

25  come and go at will." *Ibid.*  While recognizing that public schools do not assume the "power of

26  their parents" (as the officials at private schools may have delegated to them by parents), that

27  that even public schools hold "power" over children that "is custodial and tutelary, permitting a

28  degree of supervision and control that could not be exercised over free adults." *Id.* at 655.

Further, *Vernonia* explained that assessment of rights under the Fourth Amendment, as well as the First and Fourteenth Amendments rights, "are different in public schools than elsewhere," and that "the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Id.* at 656. "For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases." *Ibid.*

The factors considered by *Vernonia* included "the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it," and observing that the high Court, in prior medical testing cases, had "characterized the government interest motivating the search as 'compelling,'" when it was in the "interest in preventing railway accidents" and the "interest in ensuring fitness of customs officials to interdict drugs and handle firearms." *Id.* at 660-661 (referring to *Skinner, supra,* at 628, *Von Raab, supra,* at 670).

*Vernonia* instructed that in assessing whether there was a sufficiently "'compelling state interest'" for a warrantless examination without probable cause, "the phrase describes an interest that appears *important enough* to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." *Id.* at 661 (italics by Court). In finding such a compelling interest, the Court stated: "Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in *Von Raab, supra,* at 668, or deterring drug use by engineers and trainmen, which was the governmental concern in *Skinner, supra,* at 628. School years are the time when the physical, psychological, and addictive effects of drugs are most severe." *Vernonia* at 661.

*Vernonia* also found support for the intrusion into children's privacy for the purpose of protecting them against their own irresponsible drug abuse, to be generally supported by parents, noting "that the primary guardians of Vernonia's schoolchildren appear to agree," with the record showing " no objection to this districtwide program by any parents other than the couple before us here--even though, as we have described, a public meeting was held to obtain parents'

1  views." *Id.* at 665.  The California Legislature and Governor, elected by the public, necessarily
2  including many parents, have approved of the statutes authorizing County social workers to
3  investigate issues of suspected child abuse, and based upon suspicion custody children of and
4  authorize medical examinations to assess their general wellbeing and whether there is medical
5  evidence of abuse.  Our representative system for the enactment of such laws indicates that
6  parents in the State generally support examinations thought to advance the interests of stopping
7  child abuse.

8      The interests in the protection of children advanced by California's statutes authorizing
9  warrantless examinations do not have a law enforcement purpose like the policy at issue in
10  *Ferguson v. City of Charleston* (2001) 532 U.S. 67, wherein the Court decided that because a
11  state hospital's policy used the threat of criminal sanctions to deter pregnant women from using
12  cocaine.  That law enforcement purpose did not justify a departure from the general rule that an
13  official nonconsensual search is unconstitutional if not authorized by a valid warrant.  *Id.* at 69-
14  70, 121 S.Ct. 1281, 1284, 149 L.Ed.2d 205, 211.  The Court decided that hospital's policy
15  "plainly reveals" that the purpose served by the searches "'is ultimately indistinguishable from
16  the general interest in crime control.'"  *Id.* at 81 (quoting *Indianapolis v. Edmond*, 531 U.S. 32,
17  148 L.Ed. 2d 333, 121 S.Ct. 447 (2000)).

18      In reaching its decision, the Court in *Ferguson* distinguished the hospital's policy aimed
19  at prosecuting pregnant drug abusers from the interests in protecting against child abuse,
20  distinguishing the "case from circumstances in which physicians or psychologists, in the course
21  of ordinary medical procedures aimed at helping the patient herself, come across information
22  that under rules of law or ethics is subject to reporting requirements, which no one has
23  challenged here," including the example of laws "requiring 'any ... person having responsibility
24  for the care or treatment of children' to report suspected abuse or neglect to a peace officer or
25  child protection agency." *Ferguson* at 80-81 (referring to Ariz. Rev. Stat. Ann. § 13-3620).

26      Moreover, as previously discussed, the California statutes purpose in protecting children
27  does not hinge on law enforcement or criminal sanctions to accomplish the protective custody of
28  children and the facilitation of medical examination to assure that the child's medical needs are

satisfied and to identify transient evidence of abuse. Pursuant to Welfare and Institutions Code §324.5, DCFS had statutory authority to take custody of N.L. (or other children) and had the governmental power to have the child examined.

In the SAC, plaintiff cites *Swartwood v. County of San Diego* 84 F.Supp.3d 1093, 1122 (S.D.Cal. 2014) and *Wallis ex rel. Wallis v. Spencer* 202 F.3d 1126, 1141 (9th Cir. 2000), for proposition that that section 324.5(a) did not authorize the performance of the examination of N.L. But, as this Court has observed, "*Wallis* relegated section 324.5 to a single footnote," stated that it was refusing to address the effect of section 324.5 because it "was not enacted until … some seven years after the Wallis children were subjected to the invasive vaginal and anal examinations," and concluded it did not in that case "have no occasion to consider whether or to what extent that law is affected by our decision here." *Wallis* at 1141, fn. 12. *Swartwood* is not binding, and erroneously interpreted *Wallis* to have decided the issue of section 324.5.

Moreover, there were no private party defendants at issue in those cases. In *Wallis*, the issue was conduct of police officer of the City of Escondido. *Wallis*, 202 F.3d at 1136. In *Swartwood* none of the defendants were private parties. Rather, in *Swartwood*, the defendants were all county agencies/facilities and their employees. *Swartwood* at 1097.

The *Swartwood* and *Wallis* decisions do not address the assessment of whether private health care providers are transformed into state actors by complying with instructions of government officials who authorize abuse examinations of children, under circumstances in which the health care provider does not participate in the decision that the child be taken into custody and an examination be done.

Even if *Wallis* and *Swartwood* might support the argument that governmental agencies cannot rely on section 324.5 to justify an examination, those cases do not suggest that a private party health care provider could not perform an examination based instructions from DCFS based upon the apparent authority stated in section 324.5 and related statutes. Moreover, neither *Wallis* or *Swartwood* mentioned the provisions of Welfare and Institutions Code section 306, which authorizes DCFS to "[t]ake into and maintain temporary custody of, without a warrant, a minor," based upon the DCFS social worker assessment of "reasonable cause to believe" "[t]he

1  child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or
2  illness." According to section 306, DCFS can take custody when there is a belief that that "the
3  minor has an immediate need for medical care or is in immediate danger of physical or sexual
4  abuse or the physical environment poses an immediate threat to the child's health or safety."

5  Pursuant to section 324.5(a), DCFS is also authorized, even directed, to arrange an
6  examination of the child "by a medical practitioner who has specialized training in detecting and
7  treating child abuse injuries and neglect," with such examinations to occur within 72 hours of
8  being "taken into protective custody."

9  Penal Code §11171 states a legislative finding that "adequate protection of victims of
10  child physical abuse or neglect has been hampered by the lack of consistent and comprehensive
11  medical examinations" and calls for exams by protocol.

12  **2.  Assuming Arguendo a Constitutional Deprivation, it Was Not the Result of**
13  **Defendants' Exercise of State's Authority**

14  To be liable under § 1983, defendants must have "exercised power 'possessed by virtue
15  of state law and made possible only *because* [it] is clothed with the authority of state law.'"
16  *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40, 49 (1988) (italics added).
17  Defendants did not have governmental authority and did do anything purporting to be clothed
18  with governmental authority.  Plaintiff was taken from his parents' custody and an examination
19  was done based upon the authority of DCFS alone.    Defendants did not play a role in making
20  those decisions affecting the parent-child relationship.

21  Indeed, the Defendants' actions were consistent with restoring custody of Plaintiff to his
22  parents, as the examination performed at the behest of DCFS demonstrated there were no signs
23  of abuse, and therefore no basis for DCFS to continue to exercise custody.

24  The reasoning of *Sjurset v. Button*, 810 F.3d 609 (9th Cir. 2015), although embedded
25  within a discussion regarding the applicable of qualified immunity, indicates that a
26  constitutional deprivation does not occur when a person simply follows the apparently lawful
27  directives given by a state social worker with statutory authority to take protective custody of a
28  child.  *Id.* at 620.  Like Plaintiff herein, *Sjurset* decided that police officers did not cause a

constitutional violation when acted "at the behest of DHS" in taking protective custody of a child. *Id.* at 618. *Sjurset* emphasized that the "officers acted not independently of, but pursuant to, the protective-custody determination by DHS." *Ibid.*

In reaching its conclusion that the officers could not be liable for the alleged interference with the parent-child relationship, *Sjurset* followed Ninth Circuit observing: "in *Mueller v. Auker (Mueller I)*, a mother sued a police detective for taking custody of her sick infant without a court order, 'at the behest of hospital doctors,' despite the mother's objections. 576 F.3d 979, 982 (9th Cir. 2009). On a second appeal, we held that the detective's reliance on the doctors' medical judgment was objectively reasonable and thus granted him qualified immunity. We noted that, '[e]ven were we to assume with hindsight that the [medical] assessment was wrong, to attribute such a professional error in judgment to Detective Rogers would be manifestly inappropriate.' *Mueller II*, 700 F.3d at 1188." *Sjurset* at 614-615. "Like the two officers in *Mueller* who 'made no decisions at all,' … the Stayton officers similarly made no independent decisions regarding protective custody and merely assisted DHS in securing the children." *Sjurset* at 620. "[T]he Stayton officers did not take matters into their own hands or make their own independent judgments, as the *Wallis* officers had; instead, they called DHS for additional guidance, and Miller was dispatched to the scene. Thus, unlike the *Wallis* officers, the Stayton officers were careful not to take any action that was not first authorized by DHS." *Id.* at 618.

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999): "By contrast, in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is not responsible for the government's compulsion: [¶] *Peterson* concluded that only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion. When the state compels a private party to discriminate against members of a racial minority, it is the state action, not the private conduct, which is unconstitutional…. [¶] … [A] private party in such a case is 'left with no choice of his own' and consequently should not be deemed liable." *Id.* at 838.)

**B. Second Prong: Defendants Cannot In All fairness Be Called State Actors**

*Lee's* second prong requires Plaintiff to establish "that a person acting under color of state law committed the conduct at issue [such that their action may be attributable to the state]." *Lee*, 844 F.2d at 632-33.

The performance of a medical examination is not an inherently public function. The California Legislature has recognized that exams to detect abuse will sometimes be done by private practitioners, as reflected by the mandated reporter statute applicable to all "[l]icensed health care providers" (Pen. Code §§ 11165.9, 11165.7(a)(21)), statutes authorizing arrangements for examinations to be done by private medical providers (Welf. & Inst. Code §§ 324.5, 306, and Pen. Code § 11171). Any physician in the State is authorized to "take skeletal X-rays of the child without the consent of the child's parent … for purposes of diagnosing … possible child abuse or neglect." Pen. Code § 11171.2(a).

Plaintiff fails "to show that Defendants fostered or furthered any government policy" to deprive plaintiff of constitutional rights. *Florer v. Congregation Pidyon Shevuyim, N.A.,* 639 F.3d 916, 923 (9th Cir. 2011).

*Franklin v. Fox,* 312 F.3d 423 (9th Cir. 2002) explained: "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." *Id.* at 441; To establish a conspiracy, a plaintiff "must show 'an agreement or "meeting of the minds" to violate constitutional rights.'" *Ibid.* "Section 1983 liability attaches only to individuals 'who carry a badge of authority of a State and represent it in some capacity.'" *Ibid.* "'In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur ... sometimes if [the State] knowingly accepts the benefits derived from unconstitutional behavior.'" *Ibid.*

In this case, the only one to "carry a badge of authority" was the DCFS, not these health care provider defendants. Regarding taking custody of N.L., while the County social workers were "kicking [the mother] out of the hospital," the prior Complaint described the actions of County DCFS official Eva Yomtobian, who went to the family home, and asserted her

governmental authority by presenting "her DCFS badge and a letter from the State of California." RJN, 8:19-27. Yomtobian entered the home "[w]ithout a warrant" and "claimed to have a warrant to take N.L., but no warrant was ever provided." *Ibid.* "Two police officers soon arrived at the home." *Id.*, 8:27-28.

Importantly, Plaintiff does not allege that Defendants abused any power they may have had in performing an examination. Defendant's examination supported returning Plaintiff to the custody of his parents. Thus, this case does not present the type of issue addressed in *West v. Atkins* (1988) 487 U.S. 42, wherein a doctor contracted to provide services to inmates "misused his power by demonstrating deliberate indifference to West's serious medical needs," such that "the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care." *Id.* at 55-56 [108 S.Ct. 2250, 2258-2259, 101 L.Ed.2d 40, 53-54. Unlike in *West*, there was no use of governmental power by Defendants resulting in constitutional deprivation.

"[T]he alleged deprivation was not caused by exercise of governmental policy and does not satisfy the first step of the *Lugar* analysis." *Florer*, *supra*, 639 F.3d at 924.

### A. **Plaintiff Has Not Alleged Facts that Defendants Were State Actors**

"Employment by the state is relevant, but not conclusive, to the question of color of law." *Anthony v. Cnty. of Sacramento, Sheriff's Dep't*, 845 F. Supp. 1396, 1400 (E.D. Cal. 1994) (citing *Polk County v. Dodson*, 454 U.S. 312, 321 (1981). "For that reason, the Ninth Circuit looks to the nature of the conduct involved, as well as the surrounding circumstances, and not simply to the defendant's official capacity." *Id.* (citing *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir. 1980) for its analysis of circumstances surrounding an off-duty police officer's conduct for "indicia of state action"). "Whether a state employee acts under color of law turns on the relationship of the wrongful act to the performance of the defendant's state duties." *Id.* (citing *Dang Vang v. Vang Xiong X Toyed*, 944 F.2d 476, 479 (9th Cir. 1991)). Defendants cannot be said to abuse state-given power that they do not possess and that the state never granted them. *West*, 487 U.S. at 49 (citing *Classic*, 313 U.S. at 326).

Merely furnishing information to the government does not constitute joint action under color of state law.  In *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 783 (9th Cir. 2001), the Court explained: "A relationship of cause and effect between the complaint and the prosecution is not sufficient, or every citizen who complained to a prosecutor would find himself in a conspiracy."  *Id.* at 783; see also, *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983); *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 327 (7th Cir. 1978).  Rather, joint action "requires a substantial degree of cooperative action." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).

"In order for a private individual to be liable for a § 1983 violation when a state actor commits the challenged conduct, the plaintiff must establish that the private individual was the proximate cause of the violations." *Franklin v. Fox*, 312 F.3d 423, 445-46 (9th Cir. 2002) (citing *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir. 1986)). "Absent some showing that a private party had some control over state officials' decision to commit the challenged act, the private party did not proximately cause the injuries stemming from the act." *Id.* at 446 (quoting *Massarweh*, 782 F.2d at 829) (internal quotation omitted).  Plaintiff's allegations show that defendants did not control County officials' actions, there was no meeting of the minds, nor were defendants engaged in joint action with the County. *Fonda*, 707 F.2d at 438, *Franklin*, 312 F.3d at 446.

Plaintiff's allegations refute any conclusion that defendants "cloaked [themselves] with the authority of the state." *Howerton v. Gabica*, 708 F.2d 380, 385 (9th Cir. 1983).

*Franklin v. Fox,* 312 F.3d 423 (9th Cir. 2002), recounted, "Section 1983 liability attaches only to individuals 'who carry a badge of authority of a State and represent it in some capacity.'" *Ibid.*; citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961), overruled in part by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "'In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur . . . sometimes if [the State] knowingly accepts the benefits derived from unconstitutional behavior.'" *Ibid.*

1    Generally, the most relevant tests are the "public function" and "joint action" tests.  *Ohno*

2    *v. Yasuma, supra,* 723 F.3d at 995.  "These two tests largely subsume the state compulsion and

3    governmental nexus tests, because they address the degree to which the state is intertwined with

4    the private actor or action."  *Id.* at 995, fn. 13.  In *Ohno*, the Court, "[f]or simplicity, …

5    refer[red] only to the 'public function' and 'joint action' tests, but intend[ed] thereby to

6    incorporate all four tests."  *Ibid.*

7    The public function test "treats private actors as state actors when they perform a task or

8    exercise powers traditionally reserved to the government."  *Ohno v. Yasuma* 723 F.3d 984, 995-

9    996 (9th Cir. 2013); citing, *inter alia, Jackson v. Metro. Edison Co.,* 419 U.S. 345, 352.  The

10   action of defendants in making a report of abuse of A.L., prompting the governmental

11   investigation that led to DCFS taking custody of N.L., did not make defendants state actors

12   under the public function test.  Neither did complying with County's direction to defendants to

13   examine plaintiff to assess for potential abuse.

14   In *Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003), the Court instructed: "Under the joint

15   action test, we consider whether 'the state has so far insinuated itself into a position of

16   interdependence with the private entity that it must be recognized as a joint participant in the

17   challenged activity.  This occurs when the state knowingly accepts the benefits derived from

18   unconstitutional behavior.'"  *Id.* at 1093, citation omitted; see also, *Ohno v. Yasuma, supra,* 723

19   F.3d at 995-996.  In *Kirtley*, the plaintiff parent alleged "she was the victim of a conspiracy to

20   deprive her of custody over her granddaughter," and that a court-appointed guardian failed to

21   investigate the plaintiff-parent's ability to care for her granddaughter, "all in violation of

22   Kirtley's constitutionally protected rights."  *Id.* at 1091.  Under Washington statute, a court

23   appointed guardian occupied "two primary roles under the statutory scheme: an advocate for the

24   best interests of the child subject to the custody dispute, and an independent source of

25   information for the court regarding the circumstances of the custody dispute," concluding:

26   "Neither function has ever been held to be a traditional or exclusive governmental function

27   under this test."  *Id.* at 1093.

28   Rather, the Court explained: "Although a guardian is appointed, compensated, subject to

1  qualification, and regulated by the state, the above-quoted statute clearly indicates that the
2  intended benefits of the guardian 'flow directly to' the child, in whose interests the guardian
3  must act." *Id.* at 1093. *Kirtley* analogized "the role of the guardian as an advocate ... to the role
4  of a court-appointed public defender," noting that the Supreme Court has held that a public
5  defender does not act under color of state law when performing pure advocacy functions. *Id.* at
6  1093-1094; citing *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). Similarly, defendants here
7  when they examined plaintiff were directed by and compensated by the County, and generally
8  regulated by the state as health care provides, but the intended benefits of the examination were
9  to flow to the child, to be protected against abuse. Moreover, plaintiff's allegations emphasize
10 the unilateral decision-making of DCFS and do not suggest that any decisions by defendants
11 relative to custody or whether an examination should have been requested.

12 ## VI.   CONCLUSION

13     For all these reasons, plaintiff's action should be dismissed, without leave to amend.

14

15 DATED: April 25, 2016                 CARROLL, KELLY, TROTTER, FRANZEN,
                                         McKENNA & PEABODY
16

17                                       By:   */s/ David P. Pruett*
18                                          ROBERT L. McKENNA
                                            DAVID P. PRUETT
19                                          Attorneys for Defendant,
                                            CHILDREN'S HOSPITAL LOS ANGELES
20                                          MEDICAL GROUP

21
22 DATED: April 25, 2016                 CARROLL, KELLY, TROTTER, FRANZEN,
                                         McKENNA & PEABODY
23

24                                       By:   */s/ Richard D. Carroll*
                                            RICHARD D. CARROLL
25                                          JENNIFER A. COONEY
                                            Attorneys for Defendant,
26                                          CHILDREN'S HOSPITAL LOS ANGELES

27

28

1

**CERTIFICATE OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

3

4

5

I hereby certify that on April 25, 2016, I electronically filed the foregoing **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES** with the clerk of the United States District Court - Central District of California by using the Central District CM/ECF system.

6

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

7

8

9

10

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES** by First-Class Mail, postage pre-paid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days, to the following non-CM/ECF participants:

11

*[NONE]*

12

13

Dated: April 25, 2016                    By: ____*/S/ George Estevez*_____

14

GEORGE ESTEVEZ

15

16

17

18

19

20

21

22

23

24

25

26

27

28